UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

U.S. SPECIALTY INSURANCE COMPANY, )
CITY OF COLUMBUS, INDIANA,     )
                      )
        Plaintiffs,    )
                      )
        v.       )    1:16-cv-03210-RLY-MJD
                      )
DAIMLER TRUCKS NORTH AMERICA,  )
LLC,                )
                      )
        Defendants.    )

## ENTRY ON THE PARTIES' MOTIONS TO EXCLUDE EXPERT TESTIMONY AND ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The present case revolves around an accidental fire that significantly damaged three garbage trucks that were parked in a city parking lot. Fortunately, for all involved, nobody was injured. However, the fire did cause over $300,000 in damage prompting the present products liability lawsuit between the owner of the truck, the City of Columbus, Indiana ("City"); its insurer, Tokio Marine Holdings, Inc.[1] (collectively referred to as "Plaintiffs"); and the manufacturer of the truck, Daimler Trucks North America, LLC ("Daimler" or "Defendant").

Before the court are Defendant's motion to exclude the expert testimony of David Zedonis, Plaintiffs' motion to exclude the expert testimony of John Maurus, and

---

[1] The original policy of insurance was issued by HCC Insurance Holdings, Inc., through its division, U.S. Specialty Insurance Co. (Filing No. 13, Amended Complaint at 1 – 2, ¶¶ 2, 4). Tokio Marine Holdings Inc. acquired HCC Insurance Holdings shortly after the date of loss. (*Id.* at 2 ¶ 5).

1

Defendant's motion for summary judgment.  For the reasons stated below, Plaintiffs'

*Daubert* motion is **DENIED**, Defendant's *Daubert* motion is **GRANTED IN PART** and

**DENIED IN PART**, and Defendant's motion for summary judgment is **GRANTED IN**

**PART** and **DENIED IN PART**.

## I.    Background

In early 2008, the City issued an invitation to the public seeking bids for a new

garbage truck.  (Filing No. 76-1, Deposition of Bryan Burton ("Burton Dep.") at 19:20 –

25; 20:1 – 6)[2]; *see generally* Ind. Code § 5-22-7-1 *et seq.* (describing Indiana's bidding

process for public purchasing).  Bryan Burton, the Director of the Department of Public

Works for the City, was in charge of the bidding process and responsible for purchasing

the truck.  (Filing No. 76-1, Burton Dep. at 14:9 – 19; 20:4 – 6; 30:6 – 8).  After getting

approval from the Board of Public Works and Safety, Burton placed an order with Best

Equipment Co. Inc.—the winning bidder.  (*Id.* at 21:13 – 25; 30:21 – 24).  On May 28,

2008, the City officially purchased the 2007 M2 106V Freightliner garbage truck—the

"subject truck" of this litigation.  (Filing No. 71-12, Certificate of Title for the subject

truck).

Along with the purchase of the subject truck, the City also purchased an Extended

Warranty (the "Warranty" or "Warranty Agreement") from Daimler.[3]  (*See* Filing 71-4,

---

[2] Each party designated different portions of Burton's, Zedonis's, and Maurus's deposition.  (*See e.g* Filing Nos. 71-3 and 76-1).  Accordingly, the court includes the filing number in subsequent citations for clarity.
[3] Daimler is the manufacturer of Freightliner trucks.  (*See* Filing No. 71-2, Declaration of Charles Blakewood at 1 ¶ 3).

Extended Warranty Agreement). When purchasing trucks, the City's standard practice is to always purchase an extended warranty because it is cheaper to purchase an extended warranty than it is to pay for the repairs over time. (Filing No. 71-3, Burton Dep. at 36:7 – 19). The Warranty covers the subject truck's suspension, engine, transmission, and both the front and rear axles. (*Id.* at 57:16 – 23). The Warranty also contains certain limitations:

**Purchaser's Exclusive Remedy**
The foregoing limited warranty shall be the Purchaser's sole and exclusive remedy against Freightliner, whether in contract, under statute (including statutory provisions as to conditions as to quality or fitness for any particular purpose of goods supplied pursuant to the contract of sales), warranty, tort, strict liability, or any other legal theory.

**Freightliner Limitation of Liability**
Freightliner's liability to a Purchaser on any claim, for loss or damage arising out of, connected with, or resulting from the contract or sale, or the performance or breach thereof, or from the design, manufacture, sale, delivery, service, repair or use of any vehicle manufactured by Freightliner, shall not exceed the price to the Purchaser allocable to the part of such vehicle which gives rise to the claim and in no event shall it exceed the sales price of the vehicle. In no event shall Freightliner be liable for special or consequential damages, including, but not limited to, injuries to persons or damage to property, loss of profits or anticipated profits, or loss of vehicle use.

(Extended Warranty Agreement at 3 – 4). The Warranty Agreement is a standard form agreement, and Burton explained that he understands the terms of the agreement and that the terms are a condition to Freightliner extending the agreement. (Filing No. 71-3, Burton Dep. at 57:3 – 15). The Warranty is signed "Brian Burton," but Burton explained that the signature was not his (since it was misspelled) and he did not know who signed the document. (*Id.* at 56:2 – 13).

On May 11, 2015, the subject truck ignited resulting in a fire that damaged the subject truck and two other garbage trucks parked nearby. (Filing No. 57, Answer at 5 ¶ 16; Filing No. 71-3, Burton Dep. at 94:25, 95:1 – 4).

The origin and cause of the fire is disputed. John Maurus—a fire investigator and Defendant's expert—examined the trucks less than two weeks after the fire. (*See* Filing No. 71-13, May 22, 2015 Inspection Sheet). He concluded the fire originated in the engine compartment of the subject truck near a battery cable. (*See* Filing 71-14, Deposition of John Maurus ("Maurus Dep.") at 35:9 – 17). David Zedonis—a fire investigator and Plaintiffs' expert—examined the trucks in August of 2017, more than two years after the fire. (Filing No. 94-2, Expert Report of David Zedonis ("Zedonis Report") at 1). He concluded that the fire originated in the taillight power distribution module ("PDM"). (*Id.* at 2).

On October 17, 2016, Plaintiffs filed a complaint in Indiana state court, and on November 23, 2016, Defendant removed the action to federal court. (*See* Filing No. 1-2, State Court Record at 3; Filing No. 1, Notice of Removal). An Amended Complaint was filed on December, 15, 2016. (Filing No. 13). The Magistrate Judge whittled down[4] the Amended Complaint leaving only one

_____

[4] The Magistrate Judge dismissed Plaintiffs' breach of the implied warranty of merchantability claim because it was barred by the statute of limitations and products liability claim for damages relating to the subject truck finding that the economic loss rule barred these damages as a matter of law. (*See* Filing No. 47, Report and Recommendation at 3 – 7). Plaintiffs did not object to the Magistrate's Report and Recommendation, and the court adopted it in full. (*See* Filing No. 48). The Magistrate Judge then denied Plaintiffs' motion for leave to file a second amended complaint finding that a second amended complaint would be futile. (Filing No. 56).

remaining claim: a product liability claim alleging the subject truck was defective and seeking damages for the loss of the other two garbage trucks.  (*Id.* at 6). Defendant now seeks summary judgment on Plaintiffs' remaining claim.

## II.    Discussion

### A.    Motions to Exclude Expert Testimony

#### 1.    Legal Standard

The admissibility of expert testimony is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.  *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015).  Generally speaking, an expert's opinion must be helpful to the jury, based on sufficient facts or data, and the product of reliable principles and methods.  *See* Fed. R. Evid. 702(a) – (c); *Wood*, 807 F.3d at 834.  In addition, the expert must reasonably apply the principles and the methods to the facts of the case.  Fed. R. Evid. 702(d); *see Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012).

The district court serves as the gatekeeper for expert testimony.  *Lapsley*, 689 F.3d at 809.  This means that the court must make a determination at the outset of whether the proffered testimony is sufficiently relevant, reliable, and related to the facts of the case. *Id.* (citing *Daubert*, 509 U.S. at 592 – 93).  The court's analysis encompasses only the bases for the expert's opinions—not the opinions themselves.  *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 – 32 (7th Cir. 2013).

## 2. David Zedonis

Zedonis, Plaintiffs' expert, opined that the fire originated at the taillight PDM. Defendant seeks to preclude several of Zedonis's opinions—(1) the taillight PDM in the subject truck was exposed to similar severe environmental conditions similar to those involved in Defendant's 2008 voluntary recall; (2) the exposure to the environmental conditions led to corrosion on the PDM and its connectors; (3) the corrosion led to increased resistance sufficient to start an electrical fire; (4) the wind spread the fire from the taillight PDM to the engine compartment, and (5) the taillight PDM suffered from a defect that made it unreasonably dangerous—all because Zedonis lacks a reliable methodology. *See Lapsley*, 689 F.3d at 810; *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999). Plaintiffs respond that Zedonis's opinions are reliable and based on the facts and evidence in this case.

Turning to Defendant's first three challenges, the court finds that these opinions (collectively the "environmental exposure" opinions) are sufficiently reliable. First, Zedonis conducted an on-site inspection, during which he observed an exceptional amount of heat damage near the taillight PDM as well as significant corrosion on the PDM mounting bracket. (Zedonis Report at 11). Based on these observations, and his heating pattern and arcing pattern analysis, he concluded that the fire originated at the taillight PDM—a conclusion which Defendant does not challenge as unreliable. Second, he considered different reports concerning PDMs and environmental exposure. For example, he considered Defendant's 2008 recall (Safety Recall 08V-154) and a 2012 letter written by Defendant in response to an Office of Defects Investigation concerning

the recall.  (*Id.* at 12 – 13); (Filing No. 76-7, ODI Report of Nasser Zamani ("Zamani Report") at 2 – 3).  Both documents state that certain PDM locations are highly susceptible to water intrusion.  (Zedonis Report at 13); (Zamani Report at 1 – 2).  He also considered several of Defendant's technical reports, one of which that notes the existing PDM design—the taillight PDM design—has resulted in electrical failures and equipment fires due to water intrusion.  (Filing No. 85, Bussman Severe Service PDM Technical Report ("Bussman Report")[5] at 2).[6]

Thus, his environmental exposure opinions are based on those two analyses: his analysis of the fire origin and consideration of the reports concerning PDMs.  Defendant does not challenge the sufficiency of his fire-origin analysis, and experts may rely on other scientific or similar reports to form their conclusions.  *See Walker v. Soo Line R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000); *see also NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 789 – 790 (7th Cir. 2000).  Based on his experience and training as a mechanical engineer, Zedonis is qualified to bridge the gap between the reports and his observations and investigations of the subject truck. Accordingly, Zedonis's methodology is sufficiently reliable with respect to the environmental exposure opinions.

---

[5] It is true, as Defendant notes, that Plaintiffs designated the Bussman Report in their Surreply—not in their Response.  However, they did so in response to Defendant's representations about the Report in its Reply, and so it was proper.  Additionally, the court considers the Report because Zedonis relied on it and quoted from it in his report and because it is in the interest of justice to do so.  *See* S.D. Ind. Local Rule 56-1(l).

[6] Zedonis also relies on a comparative fire case from Shawnee County, Kansas in his report. (Zedonis Report at 14).   He reviewed the photographs and reports from that case and concluded that the PDM failure in that case was similar to the one that occurred in the present case.  (*Id.*).

Defendant argues that these opinions are not based on any testing. However, it is common for experts to rely on evidence that is reasonably relied on by experts in the field when forming their opinions. *United States v. Lawson*, 653 F.2d 299, 301 – 02 (7th Cir. 1981), *cited with approval in Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 – 13 (7th Cir. 2002). Both Nasser Zamani, Defendant's former Senior Manager, and John Maurus, Defendant's expert witness, agree that taillight PDMs—at least to some extent—are susceptible to water intrusion. (Filing No. 76-6, Deposition of Nasser Zamani at 27:3 – 10 ("Q: From your recollection of the recall and the ODI investigation, do you agree that a PDM located aft of the cab externally but inboard of the frame rail would also be exposed to some degree to water, salt and road splash? [Objection] A: I would say anything outside of the cab would be – yes, it's open to the environment."); Filing No. 76-17, Maurus Dep. at 144:8 – 12) ("Q: Well, maybe do you agree that the trailer PDM is susceptible to water intrusion. Do you agree with that? A: I would agree with that, generally speaking"). And so the absence of any splash testing or distance measurements are criticisms that can be raised on cross-examination since they go towards the weight of his testimony, not its admissibility. *See Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

Turning to Zedonis's fourth opinion, that the wind spread the fire, the court finds it is too speculative for jury consideration. *Walker*, 208 F.3d at 588 ("Expert testimony relying on the opinions of others should, of course, be rejected if the testifying expert's opinion is too speculative.") (citations omitted). Zedonis's wind opinion is based solely on the wind report from May 11, 2015. He did not do any analysis or consider the effect,

if any, of any potential inhibitors that could have altered the wind speed such as the barriers situated behind the trucks. He also did not account for any variations between the wind speed in the report, which was calculated five miles away, and the actual wind speed under the subject truck. Unlike his environmental exposure opinion, which were based on his fire investigation and various reports acknowledging an issue with PDMs and water intrusion, Zedonis's wind opinion is based on nothing more than the direction of the wind blowing that day. This is simply too speculative.

Defendant's last challenge relates to the alleged defect in the PDM's design. Defendant argues that he is not qualified to opine on the design of the PDM based on his admissions in his deposition:

> Q: Have you had any experience in your professional experience working on designing – the design of PDMs or the designing of the location of PDMs on trucks?
>
> A: No.
>
> Q: Have you been involved with any testing regarding water intrusion in PDMs?
>
> A: No.

(Filing No. 94-1, Deposition of David Zedonis ("Zedonis Dep.") at 227:10 – 17). The court agrees. Zedonis may not offer an opinion of the design of the taillight PDM since he has no professional experience working on the design of PDMs. The court will also preclude any opinions related to whether the taillight PDM was not in conformity with the state of the art in the industry at the time the subject truck was sold, whether there were reasonable safer alternative designs of the taillight PDM, and whether Defendant

should have recalled the taillight PDM because Zedonis explicitly stated he would not offer any of these three opinions. (*Id.* at 269:21 – 25; 270:1 – 14).

Lastly, Plaintiffs wish to offer evidence, through Zedonis, that Defendant relocated the PDM after 2008, but such evidence falls within Rule 407's prohibition of using subsequent remedial measures as evidence of a design defect. *See* Fed. R. Evid. 407; *see also Flaminio v. Honda Motor Co., Ltd.*, 733 F.2d 463, 469 (7th Cir. 1984) (holding Rule 407 applies to strict liability cases); *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, No. MDL–817, 89 C 8082, 1991 WL 279282, at *2 (N.D. Ill. Dec. 26, 1991) (noting the term remedial measure includes any post-accident change, repair, or precaution) (internal quotations and citation omitted).[7] Accordingly, the court will bar any evidence of designs after the City's purchase of the subject truck because such evidence would be irrelevant to what Defendant knew at the time the subject truck was manufactured and sold. *See Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015) (noting that in strict liability cases, a plaintiff must establish, among other things, that the product was *sold* in a defective condition).

### 3. John Maurus

Maurus, Defendant's expert, opined that the fire originated in the engine compartment. Plaintiffs seek to exclude Maurus's testimony altogether arguing it is not based upon sufficient facts and that his opinions are not rationally related to the facts of the case.

---

[7] This does not necessarily mean the evidence cannot be offered for another purpose such as impeachment or feasibility. These issues can be addressed later in pretrial motions.

Neither argument has merit. Maurus examined, diagrammed, and photographed the three trucks less than two weeks after the fire. (Filing No. 96-1, Expert Report of John Maurus ("Maurus Rep.") at 3 – 4). Based on his examination and evaluation of heat damage patterns, he concluded the fire originated near the underhood PDM below the left front corner of the cab. (*Id.* at 10). He then eliminated other potential causes and ultimately concluded that the fire was caused by the underhood PDM power cable coming into contact with a grounded component. (*Id.* at 15). This methodology is consistent with generally accepted fire-investigation practices. *See e.g. Gaskin v. Sharp Electronics Corp.*, No. 2:05-CV-303, 2007 WL 2572397, at *5 (N.D. Ind. Aug. 31, 2007) (finding expert opinion reliable where expert conducted an onsite investigation, took photographs, and analyzed fire burn patterns).[8]

Plaintiffs insist that Maurus's opinions are so speculative that they must be excluded because he did not consider the taillight PDM as a possible cause of the fire. But Maurus *did* consider the taillight PDM. He explained in his report that he did not believe the fire originated near the taillight PDM because of the small amount of damage at that location compared to the amount that occurred in the engine compartment. (Maurus Report at 17). And in his deposition, he acknowledges that there was excessive

---

[8] Daimler contends that Maurus's analysis followed the methodology in the National Fire Prevention Association's recommendations for fire investigations ("NFPA 921"). While his analysis might, in fact, be consistent with NFPA 921, Daimler has not pointed the court to any evidence that Maurus is aware of NFPA 921 or followed the procedures of NFPA 921. *See e.g. Kechi Tp. v. Freightliner, LLC*, 592 F. App'x 657, 668 (10th Cir. 2014) (finding fire analysis expert qualified where he was familiar with NFPA 921 and followed NFPA 921 in his investigation).

heat at the taillight PDM but explains that this breakdown was secondary to the fire in the engine compartment based on his fire pattern analysis. (Filing No. 92-1, Maurus Dep. at 122:1 – 11). Plaintiffs are free to argue to a jury that Maurus is mistaken, but those arguments are that his conclusions are wrong—not that his methodology is unreliable. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citation omitted) ("The focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions [the expert] generate[s].").

### B. Defendant's Motion for Summary Judgment

Defendant's motion for summary judgment on Plaintiffs' Indiana Product Liability Act claim rests on two separate grounds: first, Defendant argues that Plaintiffs have failed to produce sufficient evidence on any of their three product liability theories, and second, Defendant argues that Plaintiffs' product liability claim is barred by the limitation of liability contained in the Warranty. The parties agree that Indiana law applies.

### 1. Legal Standard

Rule 56 authorizes the court to grant summary judgment where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 – 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When reviewing a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party. *Weigle v. SPX Corp.*, 729 F.3d 724, 730 (7th Cir. 2013). When no reasonable factfinder could return a verdict for the nonmoving party, summary judgment is appropriate. *See nClosures Inc. v. Block and Co., Inc.*, 770 F.3d 598, 604 – 605 (7th

Cir. 2014).  If, however, a reasonable factfinder could return a verdict for the nonmoving party, then summary judgment is inappropriate and the case should be heard by a jury. *See Anderson*, 477 U.S. 248.

### 2.    Indiana Product Liability Act

Under Indiana's Product Liability Act ("IPLA"), a manufacturer is liable "for physical harm caused by a product in an unreasonably dangerous defective condition." *TRW Vehicle Safety Systems, Inc. v. Moore*, 936 N.E.2d 201, 209 (Ind. 2010) (hereafter "TRW") (citing Ind. Code § 34–20–2–1).  To prevail on a products liability claim under IPLA, a plaintiff must show that (1) the product was sold in a defective condition unreasonably dangerous to any consumer, (2) the product caused harm to the plaintiff, (3) the plaintiff was a reasonably foreseeable consumer or user, (4) the defendant was in the business of selling the product, and (5) the product reached the user or consumer without any substantial alterations.  *See* Ind. Code § 34–20–2–1; *see also Piltch*, 778 F.3d at 632; *see Weigle*, 729 F.3d at 730 – 31.

A product can be defective (the first element) in three different ways: the product contains a manufacturing defect, the product is defectively designed, or the product is unaccompanied with adequate instructions or warnings.  *See Weigle*, 729 F.3d at 731 (citation omitted).  Plaintiffs allege that the taillight PDM was defective under all three theories.

### a.    Manufacturing Defect

"A product contains a manufacturing defect when it deviates from its intended design."  *Hathaway v. Cintas Corporate Services, Inc.*, 903 F. Supp. 2d 669, 673 – 74

(N.D. Ind. 2012) (internal quotations and citations omitted), *cited with approval in Piltch*, 778 F.3d at 632 – 33. Unlike a design defect claim, which is a claim that the product is defective because of the design, a manufacturing defect claim is a claim that the product is defective because it was manufactured improperly. *See Restatement (Third) of Torts: Products Liability* § 2(a) (1988).

Here, Plaintiffs have not offered any evidence that the taillight PDM deviated from its intended design. Most, if not all, of Plaintiffs' evidence is that the *design itself* is defective because the location of the PDM makes it susceptible to water intrusion. But that is a claim that the taillight PDM is *generally* designed poorly (design defect) not that *this* taillight PDM was manufactured improperly (manufacturing defect).

Moreover, this is not an exceptional case where a jury could find the existence of a manufacturing defect through circumstantial evidence because Plaintiffs retained control over the subject truck for a long period of time and failed to offer evidence that negates other possible causes of the accident. *Cf. Gaskin*, 2007 WL 2819660 at *8 (applying Indiana law and finding there was a question of fact as to whether a television contained a manufacturing defect when it caused a fire after only being used for one month and was otherwise used properly); *see also Ford Motor Co. v. Reed*, 689 N.E.2d 751, 755 (Ind. Ct. App. 1997) (upholding a jury verdict finding that a car, which unexpectedly ignited, contained a manufacturing defect where the plaintiffs had owned the car for five months and the fire occurred in an area of the car to which the plaintiffs did not have access). Unlike in *Gaskin* and *Reed*, where the product caused a fire within a short period of time, Plaintiffs retained control over the subject truck for *seven years* before the fire occurred,

14

and Plaintiffs have not provided any evidence that eliminates other plausible explanations for the fire. *See id.* Accordingly, these cases are inapposite and Defendant is entitled to summary judgment on Plaintiffs' manufacturing defect claim.

### b. Design Defect

"[D]esign defect cases focus on the design of the product and if there was a feasible way to change the product to make it safer and avoid the injury at issue." *Kaiser v. Johnson & Johnson*, No. 2:17–CV–114–PPS, 2018 WL 739871, at *7 (N.D. Ind. Feb. 7, 2018) (applying Indiana law). Under Indiana law, whether a product is defectively designed turns on ordinary negligence principles. *TRW*, 936 N.E.2d at 209 (noting that IPLA departs from strict liability and specifies a negligence standard of proof for claims based on an alleged product design defect); *see also Timm v. Goodyear Dunlop Tires North America Ltd.*, 309 F.Supp.3d 595, 600 (N.D. Ind. 2018) ("The IPLA imposes a negligence standard for claims of defective design and failure to warn."). Thus, to sustain a claim based on an alleged defective design, a plaintiff must "establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product . . . ." Ind. Code § 34–20–2–2; *see also Timm*, 309 F.Supp.3d at 600.

Defendant argues that summary judgment is appropriate for two reasons: first, Plaintiffs have no expert evidence of a reasonable alternative design, and second, Plaintiffs cannot show that Defendant placed into the stream of commerce a defectively designed, unreasonably dangerous product. The court agrees with both contentions.

First, Plaintiffs have no evidence of a reasonable alternative design. *See e.g.*

*Piltch*, 778 F.3d at 632 ("To demonstrate a design defect under Indiana law, the plaintiff

must compare the costs and benefits of alternative designs and show that another design

not only could have prevented the injury but also was cost-effective under general

negligence principles.") (internal quotations and citation omitted); *see also Jeffords v. BP*

*Products North America Inc.*, No. 2:15–CV–55–TLS, 2018 WL 3819251, at *8 (N.D.

Ind. Aug. 10, 2018) (finding lack of testimony on an alternative design fatal to a design

defect claim). Zedonis specifically stated in his deposition that he had not done the

research to form an opinion on whether there were reasonable safer alternatives of PDMs

at the time the subject truck was sold. (Filing No. 71-16, Zedonis Dep. at 270:7 – 11).

Moreover, he admitted he has no experience designing PDMs. (*Id.* at 227:7 – 14). While

he can testify that there were problems with the location of the PDM on the subject truck,

he cannot testify that there were safer alternatives. Moreover, the Bussman Report is not

evidence of a safer alternative design because there is no evidence that it was used in

similar trucks and the report itself states that the Bussman PDM would need a redesigned

mounting bracket—which was still being addressed by design engineers. (Bussman

Report at 1 – 2). Accordingly, Plaintiffs design defect claim fails because there is no

evidence of a reasonable alternative design.[9]

---

[9] Some cases hold that a reasonable alternative design is *not* required under Indiana law. *See e.g.*
*Kaiser*, 2018 WL 739871 at *5 – 6; *see also Hammons v. Ethicon, Inc.*, Nos. 1522–EDA–2016,
1526–EDA–2016, 2018 WL 3030754, at *22 (Pa. Super. Ct. June 19, 2018) (applying Indiana
law and agreeing with *Kaiser*). In *Kaiser*, Judge Simon discussed the history of IPLA, and
explained that a safer alternative design is not a *prima facie* element of a design defect claim.

Defendant's second challenge is also persuasive. Plaintiff has failed to present sufficient evidence from which a jury could find that a defective condition rendered the taillight PDM unreasonably dangerous. *Aregood v. Givaudan Flavors Corp.*, No. 17-3390, 2018 WL 4355591, at \*9 – 10 (7th Cir. Sep. 13, 2018). There is no evidence showing the costs or benefits of other taillight PDMs, whether an alternative PDM would have prevented the fire, or that an alternative PDM was cost-effective under general negligence principles. *Id.* (holding plaintiff failed to make out claim for design defect where there was no evidence of viable alternatives); *see also Jeffords*, 2018 WL at \*8 (same). There is also no statistical evidence supporting Plaintiffs' claims. *Aregood*, 2018 WL 4355591 at \*10 (noting that statistical evidence may be helpful). Plaintiffs' evidence is that taillight PDMs generally are exposed to water intrusion, and such exposure led to the fire in the subject truck. But a jury needs more: one accident, by itself, does not necessarily mean a product is defective. *E.g. Whitted v. General Motors Corp.*, 58 F.3d 1200, 1206 (7th Cir. 1995) (citation omitted). Accordingly, Plaintiffs' failure to offer any evidence of the costs and benefits of alternative designs or that another design would have prevented the fire and was cost-effective is fatal to their design defect theory. Summary judgment must be granted in favor of Defendant.

### c.      Failure to Warn

A product that comes unaccompanied with "reasonable warnings of danger about the product" is defective "when the seller, by exercising reasonable diligence, could have

---

*Kaiser*, 2018 WL 739871 at \*5 – 6. The court does not plunge into this thicket since Plaintiff has not made this argument. (*See* Filing No. 75, Plaintiffs' Response at 27).

made such warnings or instructions available to the user or consumer." Ind. Code § 34–20–4–2(1); *see also Weigle*, 729 F.3d at 731. As with design defect claims, failure to warn claims sound in negligence. *Id.* (citing Ind. Code § 34–20–2–2). Accordingly, Plaintiffs must show that Defendant sold a product with a concealed danger of which Defendant knew or had reason to know, that Defendant failed to adequately warn Plaintiffs, and that the failure to warn proximately caused Plaintiffs' injuries. *See e.g. Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1161 – 62 (Ind. Ct. App. 1988); *see also Aregood*, 2018 WL 4355591 at *4 ("Under Indiana law, there is a duty to warn reasonably foreseeable users of all latent dangers inherent in the products use.") (internal quotations and citations omitted).

Plaintiffs' have presented sufficient evidence for their failure to warn claim to be submitted to the jury. First, Defendant had a duty to warn Plaintiffs about the dangers of its PDMs and water intrusion. Second, it is undisputed that Defendant did not provide any warnings despite its knowledge that PDMs were susceptible to such water intrusion. Lastly, a reasonable jury could reach the conclusion that water intrusion into the taillight PDM was a reasonably foreseeable result from the ordinary use of the product (the subject truck) and the lack of warnings prevented the City from conducting adequate maintenance and, thus, preventing the accident.

Defendant argues that there is no evidence that the taillight PDM suffered from any defect. However, in order to prevail on a failure to warn claim, a plaintiff need only show that there was *danger* not a *defect*. *Jarrell*, 528 N.E.2d at 1161. Just because Plaintiffs have failed to offer sufficient evidence of a design defect does not necessarily

mean that their failure to warn theory fails as a matter of law. *Aregood*, 2018 WL 4355591, at *9 – 10 (holding summary judgment was appropriate on design defect claim but remanding case back for trial on failure to warn claim).

Defendant next argues that it had no knowledge of any dangers, but there is evidence that Defendant knew—before the sale of the subject truck—that "[t]he existing PDM design had resulted in electrical failures and equipment fires due to water intrusion." (*See* Bussman Report at 2). From this, and the 2008 Voluntary Recall, a jury could find that Defendant knew of the dangers associated with taillight PDMs.

Lastly, Defendant also argues that there is no evidence that additional warnings would have made a difference. However, there is evidence that the City conducted inspections on the truck every morning, performed weekly maintenance, and addressed serious issues with the trucks. (Filing No. 71-9, Deposition of Richard Artis at 22:1 – 2; 19 – 25). Issues that are "safety sensitive" were addressed before the truck goes out on a route. (*See id.* 22:11 – 13). A jury could reasonably conclude that not only the warnings would have made a difference but also that a fire resulting from water intrusion—the dangers of which Plaintiffs' were not aware—was a reasonably foreseeable result of the ordinary use of the subject truck. *See Jarrell*, 528 N.E.2d at 1163 (finding question of fact as to proximate cause where defendant had knowledge of a danger, could have reasonably contemplated the product's use, and failed to warn of the dangers associated with such use). Summary judgment is therefore not appropriate on Plaintiffs' failure to warn claim.

### 3. Limitation of Consequential Damages

A limitation of liability may be valid if a "true negotiation over risk allocation occurs . . . ." *McGraw-Edison Co. v. Northeastern Rural Elec. Membership Corp.*, 678 N.E.2d 1120, 1124 (Ind. 1997). However, the general rule is that such disclaimers will be deemed insufficient unless the purchaser knowingly waived its rights under the contract. *Id.* at 1125 (Sullivan, J. dissenting) ("I understand the rule of law [to be]: the Products Liability Act mandates that any disclaimer as to products liability with respect to a product covered by the Act will be ineffective unless there has been a 'knowing waiver' of the purchaser's rights thereunder."), *cited with approval by Guerrero v. Allison Engine Co.*, 725 N.E.2d 479, 482 – 83 (Ind. Ct. App. 2000). The question of waiver is ordinarily a question of fact, and the burden of proof rests with Defendant. *See Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 81 (Ind. Ct. App. 2018) (citation omitted).

Defendant argues that Plaintiffs' product liability claim is barred by the limitation of liability contained in the Warranty and the Owner's Warranty Information Booklet.

There is some evidence that suggests the City waived its right to a strict liability claim. The Warranty says so itself, and Defendant points out that this was not the first time the City had purchased a garbage truck nor was it the first time that the City purchased an extended warranty. (Filing No. 71-3, Burton Dep. 57:1 – 6; 13 – 15). Burton testified that he understood that the form agreement contained the terms for the Warranty and that the terms are a condition of Freightliner extending the warranty. (*Id.*

at 57:7 – 12).  He also explained that the City had stand-by counsel available to review the City's contracts as needed.  (*Id.* at 27:24 – 25; 28:1 – 6).

However, there are other facts that suggest that the City did not knowingly waive its rights and engage in any meaningful negotiations.  For starters, Burton testified that he did not sign the Warranty, and the actual signature on the agreement misspells his first name.  (*Id.* at 56:4 – 6; Warranty at 2).  The Warranty is also a standard form contract and must be completed as part of the purchase of the truck.  (*See* Burton Dep. at 57:1 – 6; Filing No. 71-5, Owner's Warranty Information Book at 3).  There is nothing conspicuous about the language limiting the purchaser's remedies: it is in the same font as the rest of the agreement.  (*See* Warranty at 3).  Notwithstanding the language of the agreement, a reasonable jury could view the evidence and conclude that the City did not engage in meaningful negotiations about the limitations related to strict liability claims and, thus, did not "knowingly waive" its rights under Indiana law.  This factual dispute requires resolution by a jury.

## III.    Conclusion

For the reasons stated above, Defendant's motion to exclude the opinions of David Zedonis (Filing No. 93) is **GRANTED IN PART** and **DENIED IN PART**.  Zedonis is permitted to offer his environmental exposure opinions, but cannot offer an opinion on the wind or a reasonable alternative design—as fully stated earlier.   Plaintiffs' motion to exclude the opinions of John Maurus (Filing No. 91) is **DENIED**.  Defendant's motion

for summary judgment (Filing No. 70) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Plaintiffs' failure to warn claim is the only remaining claim for trial.

**SO ORDERED** this 28th day of September 2018.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.